**Supreme Court**

No. 2014-225-C.A.

(W2/12-216A)

State                      :

v.                      :

Craig Van Dongen.               :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                               :

Craig Van Dongen.                  :

Present: Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** The defendant, Craig Van Dongen, was found guilty of domestic simple assault and domestic disorderly conduct by a Superior Court justice sitting without a jury. He now appeals from the judgment of conviction, arguing that the trial justice erred by: (1) overlooking and misconceiving material evidence; (2) failing to apply the correct burden of proof with respect to his claim of self-defense; (3) barring evidence and cross-examination as to motive and bias and abusing her discretion concerning a number of evidentiary rulings; and (4) denying his motion for a new trial. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Procedural History

A criminal information filed on June 20, 2012, charged defendant with assaulting Kristine Andrew with a dangerous weapon, to wit, a foot, in violation of G.L. 1956 § 11-5-2[1] and G.L. 1956 § 12-29-5[2] (count 1) and "intentionally, knowingly, or recklessly" engaging in fighting, threatening, violent, or tumultuous behavior, in violation of G.L. 1956 § 11-45-1[3] and § 12-29-5 (count 2). The defendant waived his right to a jury trial, and a trial before a justice of the Superior Court commenced on April 23, 2013.

As in any case involving allegations of domestic assault, it is perhaps not surprising that the only percipient witnesses to the altercation were defendant and the complaining witness. Although both Ms. Andrew and defendant testified that an emotionally charged, physical altercation did in fact occur, they offered very differing versions of how it started and what exactly transpired. Accordingly, the trial justice's decision is largely predicated upon her credibility assessments. We deem it necessary, therefore, to summarize in some detail the unfortunate events as recounted by both Ms. Andrew and defendant—omitting, however, much of the expletive-laced epithets that each party claims the other copiously employed.

Ms. Andrew testified that she met defendant at the Kent County courthouse in 2006 when they were both involved in separate divorce proceedings. Shortly thereafter, the two began dating and saw each other four to five times a week. The relationship progressed and Ms.

---

[1] General Laws 1956 § 11-5-2(a) reads, in pertinent part: "Every person who shall make an assault or battery, or both, with a dangerous weapon * * * or an assault or battery which results in serious bodily injury, shall be punished by imprisonment for not more than twenty (20) years."
[2] General Laws 1956 § 12-29-5 governs the disposition of domestic violence cases.
[3] General Laws 1956 § 11-45-1(a)(1) reads, in part: "A person commits disorderly conduct if he or she intentionally, knowingly, or recklessly: * * *[e]ngages in fighting or threatening, or in violent or tumultuous behavior."

Andrew, along with her two children, moved into defendant's house. They lived together for two years, until Ms. Andrew and her children moved out in 2008 because, as described in Ms. Andrew's testimony, there was "[d]ifficulty with the relationship." Ms. Andrew further testified that she and defendant remained amicable and that they continued to date two to three times a month. In August 2009, however, their relationship ended for a period of approximately six months.

Ms. Andrew testified that the couple resumed dating when defendant visited Ms. Andrew at her parents' house and proclaimed that "he couldn't live without [her]. He said that he wanted to marry [her], and that he had changed, and he had sought counseling, and he * * * wanted to be together and enjoy [their lives] together and buy a home together and travel together." On February 14, 2010, defendant proposed to Ms. Andrew and she accepted. In November of 2010, they moved into a house in North Kingstown, which defendant had purchased.

On January 13, 2012, the couple had an argument that led to the underlying charges against defendant. The facts of the altercation were very much in dispute at trial. Ms. Andrew testified that she and defendant had returned home from dinner and were watching television in the living room, when defendant "instigated an argument." She explained that they "were watching TV, and [defendant] was packing for his [weekend] trip. And he started to complain about the house, and that it was a mess and complained that it was [her] fault and [her] children's fault and yelled at [her]." Ms. Andrew testified that she refused to engage defendant and told defendant that she was going to bed. At approximately 11 or 11:30 p.m., she took out her contact lenses, went to bed, and fell asleep. Ms. Andrew described that sometime thereafter she was awakened when defendant "came to bed yelling." She testified that defendant was yelling that the house was a mess and that it was her fault. Ms. Andrew asked defendant not to yell, but

he did not respond. He then said, "[h]ow much f'ng money is it going to take me to get rid of you?" Ms. Andrew testified that she told defendant, "I love you" and "[i]t's not about the money." Ms. Andrew stated that defendant then called her "a fucking whore" and exposed himself to her. She said that she was "afraid" and "shocked."

Ms. Andrew testified that she got out of bed, picked up the suitcase defendant had packed for the weekend, and walked "toward the [bedroom] door to ask him to go sleep down in the basement [bedroom], because he was scaring [her]," but that defendant "jumped out of the bed and grabbed the bag." Ms. Andrew added that defendant pushed her in her abdomen. She attempted to "slap [defendant] to make him stop," but defendant "grabbed [her] and screamed, 'I hate you * * *' [and he] threw [her] down on the floor." Ms. Andrew further testified that she landed on her left side and covered her face with her hands to protect herself while defendant held her down and punched her head, ear, and neck. Ms. Andrew also testified that defendant "was kicking [her] in the back, in the buttocks, [her] legs, [and her] ankle. He stomped on [her] hips. Then he punched [her] head some more." She added that, while she was on the ground, defendant had been screaming, "I wish you were dead * * * I hate you." She said she told defendant that "[she] was bleeding from [her] head and that [she] needed help," but he responded, "[y]ou're not hurt you fucking drama queen," and he kicked her in the back "three, four more times" before it stopped. Thereafter, defendant left the room and Ms. Andrew crawled to her phone on the bureau and called 911.

Conversely, defendant testified that, around 11 p.m. on January 13, 2012, he and Ms. Andrew decided to watch a television program. He stated that Ms. Andrew had fallen asleep on the couch when he got up to pack his bags for the weekend because he was going to play tennis early the next morning and then travel to see his sister in Maine. After he packed his bags, he

woke Ms. Andrew to tell her "it was time for bed."  He said that he went to bed and then she came into the room and started arguing with him.  He testified that he did not "recall how it actually got started, but [he] kn[ew] she was upset that [he] was going up to Maine by [him]self * * *."  The defendant said that, at approximately 1:30 a.m., he told Ms. Andrew that he "had to get up in the morning and [he] wanted some sleep. * * * [He] picked up [his] bags to leave the room, and she got up and just blocked the door."  He described Ms. Andrew's stance as that of a "linebacker" who would not let him leave.  He said Ms. Andrew told him, "we're going to finish this," so he put his bags down and got back into bed, while they continued to argue.  According to defendant, they argued for a "couple of hours" primarily about his family, her drinking, and financial matters.  The defendant testified that Ms. Andrew referred to his daughter and his former wife in derogatory terminology.

The defendant testified that, after arguing for another forty-five minutes, he got out of bed a second time and told Ms. Andrew that he had to go to sleep, but that she again blocked the door.  He continued: "I was going to go downstairs.  Um, I got out of bed, picked my bags up, * * * and that's when she kind of came right up to me."  The defendant described Ms. Andrew as having "kind of a crazed look in her eye," stating that "it was kind of a scary look that she gets."  He testified that she swung at him "with a closed fist."  He added:

> "She hit me with her right hand in my left eye.  And she hit me so
> hard that, um, I, I kind of blacked out momentarily. * * * I came
> to, and she was swinging at me with her left hand, and at that point
> I must have dropped the bags because I was able to deflect her
> swing a little bit.  And she didn't hit me as hard with her left hand
> as she did with the right."

The defendant continued: "I was pretty frightened at that point, and I punched her back with my right hand.  I hit her above her left eye in the forehead. * * * I hit her hard."  He described punching her as a "reflex."  He stated that they continued to fight, describing it as a "wrestling

- 5 -

match." He remembered that he "pushed her across the bed" and "she was wailing" on the floor. Thereafter, he left the room as he saw Ms. Andrew making a phone call.

A compact disc containing a recording of Ms. Andrew's call to 911 was admitted into evidence at trial. During the call, Ms. Andrew acknowledged that she slapped defendant after he called her a "fucking whore." She stated that, subsequently, defendant threw her to the floor. Throughout the call, Ms. Andrew reiterated that she was in pain.

Detective Jesse Jarvis[4] of the Town of North Kingstown Police Department and Lieutenant Ernest Robin, a paramedic for the Town of North Kingstown, were part of the team who responded to Ms. Andrew's 911 call. At trial, Det. Jarvis stated that, when he arrived at the house, Ms. Andrew opened the door and was "hysterical." "She was crying, bleeding, * * * seemed pretty out of it." Detective Jarvis observed blood "[o]n the right side of her head," describing that "she ha[d] light-colored blond hair, * * * it looked pretty bad." He testified that Ms. Andrew told him that "her fianc[é] had beat her and kicked her, punched her, stomped on her." Thereafter, Det. Jarvis searched the house for defendant and found him in a basement bedroom. Detective Jarvis testified that defendant told him, "I'm sorry, I hit her. I lost control. * * * She slapped me, so I hit her."

Lieutenant Robin testified that, when he arrived at the scene, he noticed Ms. Andrew "was visibly upset, crying * * * she had some bleeding in * * * one of her ears." He also observed that her right hand "was swollen and bruised distal from her wrist and then encompassed her thumb and forefinger." He stated that he took Ms. Andrew to Rhode Island Hospital in an ambulance.

---

[4] Detective Jarvis was a patrolman at the time he responded to the 911 call.

Doctor Elizabeth Nestor, an attending physician at Rhode Island Hospital, testified at trial based on the medical records. She stated that she treated Ms. Andrew for "an ear contusion and lacerations, hand contusion, and ankle abrasion * * * and a leg contusion and a blow to the head." Four days later, Ms. Andrew returned to the hospital complaining of blood in her urine. Doctor Francesca Lynne Beaudoin, an emergency physician at Rhode Island Hospital, testified that she treated Ms. Andrew for complaints of "hematuria, which is blood in the urine, and bruising to her flank, which is basically the side of her abdomen." Doctor Beaudoin explained that Ms. Andrew "probably had suffered some minor bruising to her kidney," and she believed that "the report of hematuria was related to trauma."

Ms. Andrew's therapist, Terry Giblin, and the couple's therapist, Peter Olivieri, also testified at trial. However, the trial justice denied defendant's request to question these witnesses on whether Ms. Andrew argued with defendant about his family during therapy sessions, stating that it was not relevant to whether the assault had happened.

After the state rested its case, defendant made a motion to dismiss count 1, assault with a dangerous weapon. The trial justice granted defendant's motion to dismiss the count as originally styled, i.e., "assault with a dangerous weapon, to wit, a foot," and the charge was amended to simple assault, a misdemeanor.[5] After the trial concluded, the trial justice issued a written decision on April 1, 2014, finding defendant guilty of simple assault and domestic disorderly conduct. In her decision, the trial justice accepted Ms. Andrew's testimony as "wholly credible," stating that her "in-court testimony [was] compellingly reinforced by the 911

---

[5] General Laws 1956 § 11-5-3(a) reads: "Except as otherwise provided in § 11-5-2, every person who shall make an assault or battery or both shall be imprisoned not exceeding one year or fined not exceeding one thousand dollars ($1,000), or both."

recording, [Det.] Jarvis, the photographic evidence of her injuries and the expert testimony of the physicians who cared for her."

Subsequently, defendant made a motion for reconsideration of his motion to dismiss, or in the alternative, to grant a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The trial justice denied both motions. The defendant was sentenced to a one-year suspended sentence with probation on count 1 and six months probation on count 2. The defendant timely appealed from the judgment of conviction.

## II

## Discussion

On appeal, defendant raises four issues. First, defendant contends that the trial justice overlooked and misconceived material evidence when considering the credibility of the witnesses. Second, he asserts that the trial justice failed to apply the correct burden of proof with respect to his claim of self-defense. Third, he asserts that the trial justice abused her discretion "by barring evidence and cross-examination as to motive and bias" and "allowing evidence that purportedly supported the prosecution and disallowing similar evidence that supported the defense." Fourth, defendant argues that the trial justice overlooked and misconceived material evidence when considering his motion for a new trial.

## A

## Credibility Determinations

### 1. Standard of Review

Recognizing that credibility assessments are inherently the function of the trial court and not the appellate court, this Court is very deferential when reviewing the credibility determinations of a trial justice sitting without a jury. "[We] will not disturb the trial justice's

findings unless they are clearly wrong or the trial justice misconceived or overlooked material evidence on a controlling issue." State v. Adewumi, 966 A.2d 1217, 1222 (R.I. 2009) (quoting State v. LaCroix, 911 A.2d 674, 679 (R.I. 2006)). "It is well-established that we 'accord a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record.'" State v. Erminelli, 991 A.2d 1064, 1069 (R.I. 2010) (quoting State v. Gonzalez, 986 A.2d 235, 242 (R.I. 2010)). "When 'the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached.'" South County Post & Beam, Inc. v. McMahon, 116 A.3d 204, 210 (R.I. 2015) (quoting JPL Livery Services, Inc. v. Rhode Island Department of Administration, 88 A.3d 1134, 1142 (R.I. 2014)).

### 2. Credibility of Ms. Andrew's Testimony

As defendant acknowledges in his papers, "the standard for overturning factual findings of a trial justice sitting without a jury is quite high"; nevertheless, he maintains that "[t]his [case] is the rare outlier which exceeds that bar." He recites a number of purported inconsistencies between Ms. Andrew's testimony at trial and statements she made to medical personnel and the police. He claims that her "accounts of a vicious beating with repeated kicks to her lower back" were belied by photographs and medical records documenting only minor injuries. The defendant also asserts that the trial justice's finding that Ms. Andrew was "wholly credible" was "impossible to reconcile with irrefutable objective evidence," and that the trial justice abused her discretion by disregarding counseling records that contradicted Ms. Andrew's testimony

concerning her relationship with defendant. Moreover, defendant contends that the trial justice erred by failing to explain why she rejected evidence that Ms. Andrew struck the first blow, injured her ear by hitting it on furniture or the floor, sought monetary damages from defendant after the incident, and had made false assertions in sworn court documents about being sexually assaulted by defendant.

Even if we were to conclude that Ms. Andrew's testimony as to the extent of her injuries was exaggerated or that her account of the incident was indeed embellished or that the trial justice's characterization of her testimony as "wholly credible" was somewhat hyperbolic, we are nevertheless satisfied that competent evidence existed on the record to support the convictions. Neither the purported inconsistencies in Ms. Andrew's testimony nor any contradictory evidence undermines the ultimate finding of the trial justice that the state proved that defendant had committed both the offenses of simple assault and domestic disorderly conduct.

"We have defined simple assault as an 'unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness.'" State v. Lomba, 37 A.3d 615, 620 (R.I. 2012) (quoting State v. Pope, 414 A.2d 781, 788 (R.I. 1980)). Domestic disorderly conduct occurs under §§ 12-29-2(4) and 11-45-1(a)(1) when a family or household member "[e]ngages in fighting or threatening, or in violent or tumultuous behavior" against another family or household member. Section 11-45-1(a)(1).

In the case at bar, the trial justice predicated her decision upon, in addition to the testimony of Ms. Andrew, the 911 recording, the testimony of Det. Jarvis, the photographic evidence of Ms. Andrew's injuries, and the testimony of Drs. Nestor and Beaudoin. The 911 recording provides a contemporaneous audio account of the immediate aftermath of the incident

in which Ms. Andrew's distress is palpable. To be sure, she explains to the operator that she slapped defendant before he threw her to the floor, yet there can be little doubt that she had just endured a very distressing and tumultuous episode.

Detective Jarvis testified that, when he responded to the house, Ms. Andrew was hysterical, "[s]he was crying, bleeding, * * * seemed pretty out of it. * * * It looked pretty bad." She told him that "her fianc[é] had beat her and kicked her, punched her, stomped on her." He observed bruises on her forehead, face, and chin area. He also noticed blood on her right ear, but he testified that she told him she had hit her head on a piece of furniture when defendant had pushed her down. After searching for defendant and announcing himself as "North Kingstown Police" in a loud voice approximately twenty times, Det. Jarvis located defendant in a basement bedroom. Significantly, defendant admitted to Det. Jarvis that he had hit Ms. Andrew after she had slapped him, stating, "I'm sorry, I hit her. I lost control." Detective Jarvis also testified that defendant said, "I punched her" and made a punching motion with his hands.

Lieutenant Robin also responded to defendant's house that morning in his capacity as a paramedic. He described Ms. Andrew as bleeding from a minor laceration and having a swollen right hand. Lieutenant Robin testified that Ms. Andrew told him that the physical altercation had started when defendant had called her a whore, then she slapped him in the face and he pushed her to the floor and "started to punch and kick her, and he wouldn't stop when she cried."

The court also heard testimony from Drs. Nestor and Beaudoin, the two emergency room physicians who treated Ms. Andrew. Doctor Nestor testified that, on January 14, 2012, Ms. Andrew presented with "an ear contusion and lacerations, hand contusion, and ankle abrasion * * * and a blow to the head." Her primary complaint was the head injury. No lab tests were ordered, however, and she was discharged after receiving ten sutures. Doctor Beaudoin, who

was qualified as an expert witness in emergency medicine, was on duty in the Rhode Island Hospital Emergency Room on January 18, 2012, when Ms. Andrew presented with complaints of blood in the urine, and bruising to the side of her abdomen. The doctor stated that she examined Ms. Andrew and observed "significant bruising" to her right flank. Although a urine test did not reveal the presence of blood, Dr. Beaudoin indicated that she assumed the hematuria was temporary, and she did not change her diagnostic impression. She further testified that, in her opinion, Ms. Andrew's complaint of hematuria was related to trauma to the kidney.

The defendant contends that the trial justice was "obligated to clarify why she rejected" evidence contrary to Ms. Andrew's testimony. We have stated that "[t]he failure to refer to other evidence contradictory to that on which the trial justice relied * * * does not constitute misconceiving or overlooking material evidence, if the trial justice refers to the evidence on which he [or she] did rely and in so doing clearly indicates that evidence to the contrary is rejected by him [or her]." DiMaio v. Del Sesto, 102 R.I. 116, 122, 228 A.2d 861, 864 (1967). "It is well settled that where the testimony of two witnesses is conflicting and the trier of facts expressly accepts the testimony of one of the witnesses, he implicitly rejects that of the other." Blecha v. Wells Fargo Guard-Company Service, 610 A.2d 98, 102 (R.I. 1992) (quoting Turgeon v. Davis, 120 R.I. 586, 592, 388 A.2d 1172, 1175 (1978)). Thus, the trial justice impliedly rejected defendant's testimony by her express acceptance of Ms. Andrew's conflicting testimony. See id. Accordingly, we are satisfied that the trial justice did not overlook or misconceive any evidence.

We are of the opinion, therefore, that sufficient competent and credible evidence exists in the record to support the trial justice's finding beyond a reasonable doubt that defendant committed the offenses of simple assault and domestic disorderly conduct. The trial justice, an

experienced justice who observed the demeanor and conduct of the two principal witnesses, emphatically accepted the testimony of Ms. Andrew. The defendant's arguments on appeal provide inadequate cause to reject her credibility determinations.

**B**

**Self-Defense**

The defendant contends that he presented "sufficient evidence to raise a self-defense claim," and that the trial justice erred by failing to require the state to disprove self-defense beyond a reasonable doubt. The defendant maintains that the trial justice "erroneously overlooked significant evidence of self-defense," specifically, his testimony that Ms. Andrew struck the first two blows, and his facial injuries. The defendant also asserts that Ms. Andrew "admitted to the 911 operator, investigating police officer, paramedic, and emergency room nurse that she initiated the physical attack."[6]

"It is well settled that '[u]nder the law relating to self-defense, one may defend oneself whenever one reasonably believes that he or she is in imminent danger of bodily harm at the hands of another.'" State v. Urena, 899 A.2d 1281, 1288 (R.I. 2006) (quoting State v. D'Amario, 568 A.2d 1383, 1385 (R.I. 1990)). Although "[o]ne 'need not wait for the other to strike the first blow[,] * * * such a person must use only such force as is reasonably necessary for his [or her] own protection.'" Id. (quoting D'Amario, 568 A.2d at 1385). "The permissible degree of force used in defense of oneself varies with the particular set of circumstances in which he or she acts, but in no set of circumstances may one apply more than that degree of force necessary to prevent bodily injury." State v. Linde, 876 A.2d 1115, 1129 (R.I. 2005) (quoting D'Amario, 568 A.2d at

---

[6] Although Ms. Andrew admitted to slapping defendant, the record is devoid of any evidence that she admitted to initiating the attack, and defendant fails to point to specific evidence in the record to support his allegations that Ms. Andrew made these admissions.

1385). "In addition, a defendant who was the initial aggressor of the combative confrontation is generally not entitled to rely on self-defense." Urena, 899 A.2d at 1288.

In the case under review, the trial justice credited Ms. Andrew's testimony that defendant was the initial aggressor by "jump[ing] toward her and push[ing] her in the abdomen." Moreover, the trial justice specifically rejected defendant's contention that the state failed to carry its burden of proving beyond a reasonable doubt that defendant's use of force was unreasonable in the exercise of self-defense. Based upon our review of the record, we are satisfied that there was sufficient evidence to support the trial justice's conclusions. In addition to Ms. Andrew's testimony that defendant had punched and kicked her after throwing her to the floor, defendant testified that he had punched her "hard" and admitted to Det. Jarvis that he had "lost control." Also, photographic exhibits and medical evidence demonstrate that Ms. Andrew did in fact sustain injuries and that her reported hematuria was related to trauma.

The pith of defendant's argument concerning self-defense is again a challenge to the credibility determinations and factual findings of the trial justice. It is a most difficult hurdle to overcome in a jury-waived trial. As we have often stated: "[F]actual findings of a trial justice sitting without a jury are granted an extremely deferential standard of review." State v. Gianquitti, 22 A.3d 1161, 1165 (R.I. 2011).

## C

### Evidentiary Rulings and Cross-Examination

The defendant also takes issue with a number of evidentiary rulings that the trial justice made during the course of the trial. He maintains that he "unsuccessfully sought to introduce evidence and elicit cross-examination to prove that Ms. Andrew, fueled by his rejection and her

- 14 -

precarious financial position, was vengeful and motivated to instigate the incident, fabricate her claims, and extract money from him."

The defendant argues that the trial justice violated his constitutional rights and committed an abuse of discretion "by barring evidence and cross-examination as to motive and bias," and "by allowing evidence that purportedly supported the prosecution and disallowing similar evidence that supported the defense." Specifically, defendant contends that the trial justice erred by barring him from cross-examining Ms. Andrew as to her finances and by refusing to admit counseling records that referenced Ms. Andrew's financial conflicts with defendant, "her fear of being on her own," her conflicts with his family members, her alcohol use, and a "showdown" over setting a wedding date. He contends that the trial justice either prevented him from introducing such evidence or "failed to appreciate its significance" and that she barred impeachment evidence that "exposed Ms. Andrew's lack of candor and credibility." Moreover, defendant maintains that the trial justice erred by admitting only those portions of counseling records that purportedly supported Ms. Andrew's account of the altercation.

### 1. Standard of Review

Pursuant to the Sixth Amendment of the United States Constitution, and article 1, section 10 of the Rhode Island Constitution, this Court has held that "it is axiomatic that 'the trial justice may not totally prevent the defendant from exploring the issues of motive, bias, or prejudice in the testimony of the state's chief witness.'" State v. Oliveira, 882 A.2d 1097, 1122 (R.I. 2005) (quoting State v. Parillo, 480 A.2d 1349, 1357 (R.I. 1984) (emphasis omitted)). As such, the "trial justice has no discretion at all under the confrontation clause to completely prohibit defense counsel from attempting to elicit testimony from a crucial witness to demonstrate bias upon his part." Id. (quoting Parillo, 480 A.2d at 1357 (emphasis omitted)). "For cross-examination to

satisfy constitutional guarantees, the trial justice is required to afford the accused 'reasonable latitude' to establish or reveal bias, prejudice, or ulterior motives as they may relate to the case being tried." Id. at 1122-23 (quoting State v. Hazard, 745 A.2d 748, 756 (R.I. 2000)).

"[O]nce sufficient cross-examination has been allowed, the constitutional safeguards are satisfied, and any further cross-examination is left within the sound discretion of the trial justice." Oliveira, 882 A.2d at 1123 (quoting Hazard, 745 A.2d at 756). Thus, when "the trial justice does not totally prevent or completely prohibit the defendant from exploring the issues of motive, bias, or prejudice of the witness, we employ an abuse-of-discretion standard on review." Id. at 1122. "It is well settled that this Court will not disturb a trial justice's ruling on an evidentiary issue unless that ruling constitutes an abuse of the justice's discretion that prejudices the complaining party." Thomas v. Proctor, 63 A.3d 881, 884 (R.I. 2013) (quoting State v. Tetreault, 31 A.3d 777, 782 (R.I. 2011)).

### 2. Analysis

In this case, defendant conducted an extensive cross-examination of Ms. Andrew, which included questioning Ms. Andrew on her finances, the engagement, and setting a wedding date. Thus, defendant was not barred from "exploring the issues of motive, bias, or prejudice" in Ms. Andrew's testimony. See Oliveira, 882 A.2d at 1122 (quoting Parillo, 480 A.2d at 1357). Nor do we perceive any abuse of discretion in her rulings limiting cross-examination.

The record further reflects that, at the conclusion of the testimonial evidence, defendant moved to admit into evidence many of the counseling records from Ms. Andrew's individual therapist and the couple's therapist. He argued that "the records are probative of her increasing anger towards him for rejecting her and her bias against him, which apparently flowed from his expressed intent to terminate their lifestyle arrangement, and as a motive to pick a fight and a

motive to exaggerate her injuries in this case." The trial justice admitted eight such records and ruled six as inadmissible. In excluding the evidence, the trial justice stated that evidence of the couple's past arguments and disagreements at therapy sessions was not relevant, and would not help determine factually what happened on the night of the alleged assault. Moreover, the trial justice allowed testimony as to the couple's (as she characterized it) "sometimes tempestuous[] relationship," and their disagreements over families, household work, and finances, which the couple worked on at therapy. We agree with the trial justice that there was sufficient evidence presented concerning the night of the altercation and the relationship of the parties. Thus, we are satisfied that the trial justice did not abuse her considerable discretion or prejudice defendant by excluding certain counseling records.

## D

## Motion for New Trial

Finally, defendant avers that the trial justice erred by overlooking and misconceiving material evidence in denying his motion for a new trial. Specifically, defendant contends that the trial justice overlooked that Ms. Andrew's testimony was not supported by her 911 call and the evidence presented at trial describing her injuries, and he also contends that Ms. Andrew varied her accounts of the incident and evaded answers about the state of her relationship with defendant. The defendant maintains that the trial justice erred by ignoring his testimony about self-defense and refusing to consider or admit evidence of Ms. Andrew's bias and motive, including counseling records. We see no merit to these contentions.

### 1. Standard of Review

Rule 33 of the Superior Court Rules of Criminal Procedure provides in part: "On motion of the defendant the court may grant a new trial to the defendant if required in the interest of

justice. If trial was by the court without a jury, the court * * * may vacate the judgment, take additional testimony, and direct the entry of a new judgment." In reviewing the denial of a Rule 33 motion in a jury-waived trial, this Court "appl[ies] the same deferential standard of review as would be applied to the Superior Court justice's factual findings on the merits." State v. DiPetrillo, 922 A.2d 124, 131 (R.I. 2007). "Such determinations are entitled to great weight and will not be disturbed unless the trial justice has overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." Id. (quoting State v. Champagne, 668 A.2d 311, 313 (R.I. 1995)).

## 2. Analysis

In denying the defendant's motion for a new trial, the trial justice incorporated her written decision in which she found the defendant guilty of both charges. As we stated above, there is competent evidence in the record to support the trial justice's findings. See South County Post & Beam, Inc., 116 A.3d at 210 (stating that this Court will not substitute a trial justice's findings when there is "competent" evidence on record to support that trial justice's findings). Accordingly, we hold that the defendant has failed to demonstrate that the trial justice overlooked or misconceived evidence or otherwise clearly erred.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record of the case shall be returned to the Superior Court.

Justice Flaherty did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** State v. Craig Van Dongen.

**CASE NO:** No. 2014-225-C.A.
(W2/12-216A)

**COURT:** Supreme Court

**DATE OPINION FILED:** February 24, 2016

**JUSTICES:** Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:** Washington County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Melanie Wilk Thunberg

**ATTORNEYS ON APPEAL:**

For State: Jane M. McSoley
Department of Attorney General

For Defendant: Karen A. Pelczarski, Esq.