June 20, 2018

**Supreme Court**

No. 2016-182-C.A.
(P2/13-2607A)

State                                 :

v.                                 :

Tory Lussier.                                 :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                  :

v.                  :

Tory Lussier.          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  The defendant, Tory Lussier, appeals from a judgment of conviction on one count of felony assault following a jury-waived trial in the Superior Court. A group consisting of the defendant, his friends, and his brother—most of whom were off-duty Marines—was involved in a late-night melee with some students from Brown University.  After the brawl had subsided and the groups were heading their separate ways, the defendant ripped off his shirt, ran back toward the site of the donnybrook, and landed a punch to the head of Joseph Sharkey.  According to the defendant, that punch was in defense of himself and his companions; according to the state, it was an uncalled-for sucker punch.  The trial justice agreed with the state's theory and found the defendant guilty.

This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. The defendant contends that there was sufficient evidence of self-defense to require a finding of not guilty.  The defendant further argues that the trial justice overlooked material evidence in

- 1 -

carrying out his fact-finding function. After considering the parties' written and oral submissions and after reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth below, we affirm the judgment of conviction.

# I

## Facts and Travel

The defendant and his friends Joseph Ryan, Joseph Parrish, and Andrew Parrish were all United States Marines who had served in the same unit, and they had been deployed to Afghanistan together. They considered themselves to be brothers, and each knew the importance of always having each other's back. Unfortunately, during the early morning hours of May 12, 2013, they became brothers in arms in a manner that they did not anticipate.

After the four Marines returned from active duty, they made plans to get together and enjoy a night socializing in Providence. The defendant, Ryan, Joseph, Andrew, and defendant's younger brother, Derek, first convened for dinner.[1] Eventually, they made their way to the East Side of the city, where the comrades spent the remainder of their night drinking at a bar located near Brown University. The defendant estimated that he had consumed at least seven drinks at the bar, and he described himself as having been intoxicated that night. The defendant was known to his friends to sometimes become irritable and angry when he was drinking. Shortly before the 2:00 a.m. closing time, the group left the establishment in search of late-night food. Trouble ensued, however, while they were en route to their vehicles.

---

[1] Due to the commonalities of both first and last names in this case, we will refer to the Parrish brothers and defendant's brother by their first names and Joseph Ryan by his last name. We intend no disrespect to anyone involved.

As the group walked on Thayer Street, in the vicinity of George Street, they passed by two individuals. The larger of the two, Dillon Ingham, a Brown University football player, somehow insulted Ryan. Joseph intervened, and a fight erupted. Ingham punched Joseph and knocked him out. Either Ingham or his cohort rendered Ryan unconscious as well. Indeed, Ryan suffered a concussion and broken orbital bone, nose, and tooth.[2] Andrew and Derek then jumped into the fray to battle with Ingham.

Meanwhile, defendant had engaged in fisticuffs with the other individual who had been standing with Ingham. The defendant, Ryan, and Derek all identified that second individual as Sharkey, a Brown University basketball player who would ultimately become the complaining witness at trial.[3] Soon enough, the melee petered out. Andrew pulled Derek away from Ingham, who raised his hands and began to back away. At that point, the police arrived, and the crowd scattered.

The defendant was later seen on surveillance video pulling his shirt off and walking back in the direction of the initial confrontation as the first police cruiser arrived at the scene. By the time the camera panned in that direction, an individual—later identified as Sharkey—could be seen lying motionless on the ground, his body half in the street and half on the sidewalk. Sharkey had been badly injured and he had apparently collapsed and hit his head on the concrete.

---

[2] At trial, Ryan was unable to say definitively which of the two had hit him. However, it was Ingham who was charged with felony assault of Ryan and misdemeanor simple assault of Joseph. Ingham's felony-assault charge was later reduced to a simple assault in exchange for his pleading nolo contendere to both misdemeanor counts. He received one year of probation.

[3] As a result of the injuries that he suffered, Sharkey could not remember what transpired that night. He did, however, testify that he and Ingham were "acquaintances" who were in the same fraternity. Sharkey explained that, because "Brown doesn't recognize Greek life," "[i]t's not really a fraternity, just a house where everybody lives." Theirs was a dorm that housed football and basketball players, but, according to Sharkey, he and Ingham were not all that close and did not hang out socially. In fact, Sharkey did not know Ingham's actual first name, but only his nickname, until after the unfortunate events that precipitated this trial.

To save his life, it was necessary to remove a portion of his skull to stop his brain from swelling.[4]  In fact, Sharkey's injuries were so severe that Providence police initially treated the case as a homicide investigation.

Numerous witnesses testified to what had transpired in the seconds between the time that defendant was seen heading back toward the scene of the initial confrontation and the time that Sharkey was grievously injured.  Katherine Mahoney said that she had been out with Sharkey that night; they were merely friends at the time, although the relationship did ripen into romance at a later time.  Mahoney explained that she and Sharkey had just left an on-campus bar and that they were walking on Thayer Street when they saw a commotion.  According to Mahoney, Sharkey then walked over to the "late night brawl" while she remained on the sidewalk.  She testified that she was watching him the whole time and that she did not see him throw any punches or touch anyone whatsoever.  Sharkey was in the middle of the fighting for ten seconds at most, Mahoney said, before she called for him to get out of there and, whether her entreaty was the reason or not, he did so.  Mahoney said that, less than a minute later, she and Sharkey were talking on the sidewalk approximately thirty feet away from where the fighting had taken place.  Mahoney testified that Sharkey had his back turned to the fight and that defendant ran toward them from that direction.  It was then that Mahoney saw defendant punch Sharkey in the side of his face from behind, and she watched as Sharkey "fell and smashed his head on the concrete."  The defendant ran away, leaving Mahoney with the unresponsive and bleeding Sharkey.  The police arrived within seconds.

Wooyoung Moon, a student at Brown University, also testified to what he witnessed. Moon said that he had been out with some friends that night and that he was sober.  He related

---

[4] Sharkey testified that, ever since his injury, he has been prone to seizures.

that he was walking on Thayer Street when he heard a commotion. Moon testified that he looked up and saw a brawl going on, although it appeared to him to be "a gang of people ganging up on this one guy and punching him." Moon said that he watched the fight for ten to twenty seconds and that he was about fifteen to twenty yards away from it. He then looked down at his phone, struggling to find the phone number for the Brown University police, and by the time he looked back up, the fight had settled down. He said that there was still some jawing going on, but no punches were being thrown. Moon then watched as defendant walked along Thayer Street, and Moon presumed he was going to his car. Moon also saw "this guy and this girl standing * * * on the sidewalk north of this clump of people." Moon testified that he thought defendant would simply walk past the couple, but instead defendant suddenly punched the man. As the man fell to the ground, Moon heard defendant yelling expletives at the man while the woman screamed for defendant to stop. The defendant then continued walking on Thayer Street, but when the police arrived just seconds later, Moon testified that defendant ran right past him and ducked down a side street.

When defendant testified, he painted quite a different picture. The defendant said that Sharkey was with Ingham, that it was they who had initiated the scuffle, and that he saw Sharkey kicking Ryan. At that time, defendant testified, he jumped into the ruckus and he and Sharkey actually exchanged blows for about twenty seconds. After Sharkey landed a punch to defendant's face, defendant said that he put Sharkey in a headlock until a woman came along and pulled Sharkey out of the brawl by his belt. Meanwhile, Derek was still engaged with Ingham farther down Thayer Street, so defendant ran to his brother's aid. He said that that was when the surveillance video captured Ingham backing away from the group of Marines with his hands raised, seemingly in a gesture of surrender. The defendant testified that he then saw Sharkey

walking in his direction and "[f]ully looking" at him, and defendant "felt like it was him or me that was going to be hit * * *." And, defendant said, if it was not him who Sharkey was going to assault, it would have been one of his fellow Marines or his brother. The defendant said that he punched Sharkey but once. The defendant testified that it was simply a "reaction[,]" that he "felt like it was fight or flight * * *."

The trial justice did not see it that way. The trial justice found Moon to be the most credible witness because he was the only person testifying who was completely disinterested and because he had not been drinking that night. The trial justice also held that the testimony of Moon and Mahoney and the events depicted in the surveillance video were corroborative of each other. The trial justice did not find any credible evidence that supported defendant's story, and he determined that the initial confrontation had concluded before defendant punched Sharkey. Based on those findings, the trial justice said that he was "constrained to conclude that this was not a case of self-defense or defense of others, rather it was an act of retribution to even the score for what happened earlier to [defendant's] friends at the hands of the other Brown University student, Dillon Ingham." Therefore, the trial justice found defendant guilty of felony assault.[5]

---

[5] At the time the criminal information was filed in this case, G.L. 1956 § 11-5-2 defined felony assault as follows:

> "(a) Every person who shall make an assault or battery, or both, with a dangerous weapon, or with acid or other dangerous substance, or by fire, or an assault or battery which results in serious bodily injury, shall be punished by imprisonment for not more than twenty (20) years.
> "* * *
> "(c) 'Serious bodily injury' means physical injury that:
> "(1) Creates a substantial risk of death;
> "(2) Causes protracted loss or impairment of the function of any bodily part, member or organ; or

The trial justice sentenced defendant to seven years at the Adult Correctional Institutions, all suspended with probation; 1,000 hours of community service; weekly counseling for two years for treatment for his anger issues, PTSD-related symptoms, and alcohol abuse; and weekly random substance abuse screenings.

## II

## Standard of Review

"In a jury-waived criminal proceeding, this Court gives deference to a trial justice's finding[s] of fact[]" and determinations of credibility. *State v. Medeiros*, 996 A.2d 115, 121 (R.I. 2010) (quoting *State v. Adewumi*, 966 A.2d 1217, 1221-22 (R.I. 2009)). This is so because we

> "accord a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." *Id.* at 122 (quoting *State v. Erminelli*, 991 A.2d 1064, 1069 (R.I. 2010)).

Therefore, "this Court will not disturb the * * * findings [made by a trial justice sitting without a jury] unless they are clearly wrong or the trial justice misconceived or overlooked material evidence on a controlling issue." *Id.* at 121 (quoting *Adewumi*, 966 A.2d at 1222). At the same time, however, "our role is not simply to rubber-stamp the trial justice's findings of fact; rather, our role is 'to review the record carefully to see if it in fact contains sufficient evidence to support the trial justice's conclusion.'" *State v. Forand*, 958 A.2d 134, 138 (R.I. 2008) (quoting *State v. Harris*, 871 A.2d 341, 346 (R.I. 2005)). "When the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for

> "(3) Causes serious permanent disfigurement or circumcises, excises or infibulates the whole or any part of the labia majora or labia minora or clitoris of a person."

- 7 -

his [or hers] even though a contrary conclusion could have been reached." *State v. Van Dongen*, 132 A.3d 1070, 1076 (R.I. 2016) (quoting *South County Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 210 (R.I. 2015)).

### III

### Discussion

The defendant takes issue with the trial justice's decision that the state successfully rebutted defendant's self-defense claim beyond a reasonable doubt.[6] That argument is inherently related to his other argument: that the trial justice overlooked certain evidence in arriving at his decision. The defendant contends that, because the trial justice did not recite or summarize Andrew's testimony when delivering his bench decision, he must have overlooked it, and, according to defendant, consideration of that testimony would have swung the weight of the evidence back in his direction. In our opinion, that argument misses the mark.

It is significant that, as he rendered his decision, the trial justice explained:

> "I have reviewed all of the witnesses who testified in this case, but the most relevant and most significant testimony which I have just placed on the record is from those witnesses that I've just recited testimony from. There were a number of other witnesses who certainly testified in this matter. I've considered that testimony, but this testimony that I've just recited has the most bearing on the legal issues before this Court. I just don't want anyone to think I overlooked the other witnesses."

In defendant's view, though, the trial justice did just that: "overlooked material evidence on a controlling issue." *Medeiros*, 996 A.2d at 121 (quoting *Adewumi*, 966 A.2d at 1222). We do not agree. Simply because the trial justice did not go through each painstaking detail of every witness's testimony, it cannot be concluded that he did not consider it. To the contrary, he

---

[6] "Once a defendant introduces evidence of self-defense, the burden is on the state to negate that defense beyond a reasonable doubt." *State v. Urena*, 899 A.2d 1281, 1288 (R.I. 2006).

- 8 -

professed that he did in fact consider it, and his bench decision evinces that he had clearly and comprehensively reviewed the evidence adduced at trial.

Furthermore, our review of the record leaves no doubt whatsoever that sufficient competent evidence existed to support the trial justice's decision. *See Forand*, 958 A.2d at 138. The trial justice had ample evidence before him to support both the state's theory of the case as well as defendant's. The trial justice discussed and analyzed both theories, and he made factual findings and credibility assessments that led him to side with the state in concluding that defendant had not assaulted Sharkey in an effort to defend himself, his friends, or his brother. Moreover, even if we were to disagree with that outcome, we are not in the business of replacing the trial justice's view of the evidence with our own. *See Van Dongen*, 132 A.3d at 1079.

It seems to us that the defendant's twofold argument—that the evidence of self-defense negated a guilty finding, and that the trial justice overlooked evidence in finding defendant guilty—is nothing more than a manifestation of the defendant's disagreement with the findings of fact and determinations of credibility that the trial justice did place on the record. That, certainly, "is a most difficult hurdle to overcome in a jury-waived trial." *Van Dongen*, 132 A.3d at 1079. It was the defendant's considered decision to waive his right to a trial by jury and put his fate in the hands of a seasoned justice of the Superior Court, who, it turned out, did not see things the way the defendant would have wished. In our opinion, there was no error in this trial.

## IV

### Conclusion

The judgment of conviction is affirmed. The record shall be returned to the Superior Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Tory Lussier. |
| **Case Number** | No. 2016-182-C.A. <br> (P2/13-2607A) |
| **Date Opinion Filed** | June 20, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State: <br><br> Owen Murphy <br> Department of Attorney General <br> For Defendant: <br><br> Megan F. Jackson <br> Office of the Public Defender |