HENRY DEATTE *vs.* EMMA H. DUXBURY *et al.*

DECEMBER 18, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

2

CAPOTOSTO, J. This is a bill in equity brought against Emma H. Duxbury as sole heir at law and next of kin of Carrie E. Deatte, late of the city of Providence, deceased. Harold A. Duxbury is joined as respondent in his individual capacity as husband of Emma H. Duxbury, and also in his representative capacity as administrator of the estate of Carrie E. Deatte. The bill prays that, because of an agreement alleged to have been made by Carrie E. Deatte with the complainant to make a will leaving him all of her property, which she did not do, the complainant be declared the owner of such property; and further, that the respondents be declared trustees for his benefit of the property left by her at the time of her death.

The cause was heard before a justice of the superior court on bill, answer, replication and proof; and he ordered the entry of a decree denying and dismissing the bill. The complainant appealed to this court from such decree.

The evidence shows that, following a divorce from her first husband, Carrie E. Deatte married the complainant in 1906. For the purpose of drawing certain inferences favorable to the complainant from the testimony in this cause, counsel for the complainant suggests the possible invalidity of this marriage because it was entered into before the entry of the final decree in the divorce case. We attach no significance to such suggestion in the peculiar circumstances of this case.

Carrie E. Deatte was older than the complainant. When they married, she had a daughter, the respondent Emma H. Duxbury, by her first marriage. No child was born to the Deattes. After her marriage to the complainant, Mrs. Deatte carried on for some years certain small business enterprises, while the complainant was employed from time to time at various occupations until 1910. In that year he joined the Providence Fire Department; and he was retired therefrom on a pension in 1937.

On March 28, 1921, the Deattes purchased a lot of land near the fire station where the complainant was employed. The deed to this land was taken in both their names as tenants in common. A construction mortgage for $3800 was placed on that property July 21, 1925, and a house built thereon. It was the Deatte home until Mrs. Deatte died in 1939. Apparently the lot was purchased, and the mortgage was paid off by 1935, both with complainant's money.

The family history of the Deattes prior to 1936 is important only in so far as it furnishes a background to the occurrences from that date to the death of Mrs. Deatte. There is no necessity for us to refer specifically to the many incidents before 1936 appearing in the sharply conflicting testimony in this cause. It is sufficient for our purposes to say that during the later years of the period from 1925, when the Deattes moved to their new home, to 1936 Mrs. Deatte became increasingly querulous, such attitude on her part being mainly due to jealousy caused by what she believed was undue friendship on the part of her husband with women, and particularly with a married woman who lived in the neighborhood. He, on the other hand, persisted in such friendship with that woman and her family, which, even though innocent, apparently tended to irritate his wife and lend some faint color to her jealous suspicions.

In 1936 the complainant conveyed his interest in the real estate to his wife. He claims that he did this under an agree-

ment with her that she would make a will "protecting" him. The circumstances under which this deed was made are as follows: Mrs. Deatte went alone to her attorney and asked him to draw such a deed, telling him, according to his testimony, that her husband "had spent all her money, and she wanted the property;" that he was getting "some $40.00 and something a week from the Fire Department"; that he was giving her "hardly nothing to live on, and a general run of domestic troubles." The complainant thereafter went alone to the attorney's office, saw the deed as drafted and said that he wanted to think it over. He called a second time in company with his wife and then executed the deed, which the attorney delivered to the wife in his presence. The attorney further testified: "Q. Now at the time that Mr. Deatte executed the deed was anything said about any kind of agreement? A. Not a word." This testimony was not contradicted. This deed was never recorded, but was kept by Mrs. Deatte in a tin box belonging to her.

On February 26, 1937, Mrs. Deatte executed a will which excluded her husband and left all her property to her daughter, Emma H. Duxbury, one of the respondents in this cause. The will was also kept by Mrs. Deatte in the tin box just mentioned.

The complainant knew that his wife had executed such a will. He testified that later she, in his presence, destroyed by burning the "will and all", apparently meaning the will and the deed above mentioned, saying that she had made such a will just to "worry" him. While the complainant asserts that Mrs. Deatte burnt the will, the respondents claim that the surrounding circumstances and the inferences therefrom reasonably warrant the conclusion that the will was surreptitiously taken and destroyed by the complainant.

Mrs. Duxbury testified that on a certain occasion when her mother opened the tin box to get some insurance papers she found the box empty and exclaimed: "My God, every-

thing is gone, will and deeds and everything." In cross-examination the complainant admitted that, after the will was executed and before the alleged burning, his wife complained to him that the tin box, containing the will and which she kept either at her daughter's house or at her own home, had "been tampered with." The complainant suggests that such tampering was probably done by the daughter, while the latter urges that she had no reason, and that the former had every reason, to tamper with the tin box in order to secure and destroy the will. No will was found upon Mrs. Deatte's death.

In September 1937 the Deattes went to Florida and came back to Rhode Island on February 2, 1938. The complainant in substance testified that, owing to unusually bad weather conditions in Florida, they returned home at that time because of his solicitude for Mrs. Deatte. On the other hand, the respondent Emma H. Duxbury testified that her mother told her that they came home because her husband liked a certain woman "so well he had to come home." Be this as it may, what happened was that on February 2, 1938, the Deattes returned to Rhode Island, and on February 5, 1938 the complainant brought an action for divorce against his wife on the ground of extreme cruelty.

When Mrs. Deatte went to consult her attorney, the one who had drawn her will and the deed hereinbefore mentioned, about this divorce case, he informed her that he did not take such cases and referred her to another attorney, who agreed to represent her. On April 5, 1938, Mrs. Deatte filed a cross petition for divorce also on the ground of extreme cruelty. A reconciliation followed. On April 19, 1938, the complainant, by deed of that date, again conveyed his interest in the property in question to his wife, whereupon the attorneys for the respective parties discontinued by stipulation the pending divorce proceedings. It is clear that, in effecting this settlement, the attorneys were not told by either party

that the complainant was conveying his interest in that property upon his wife's promise to leave him her property by will. This deed was recorded June 3, 1938.

In explanation of why he had brought a petition for divorce against his wife, the complainant testified that "it was more to tantalize her than anything else, to see if I could scare her to take a different attitude toward me, but it didn't seem to have the desired result." Respecting the nondisclosure of Mrs. Deatte's alleged promise to make a will in his favor in return for a deed of his interest in the property when the divorce proceedings were discontinued, he testified, in substance, that such nondisclosure was at the request of Mrs. Deatte, and that he executed the deed of April 19, 1938 to please her, as he "felt she was an old woman and very ill." He further testified that he had never asked her if she had made a will in accordance with her agreement with him "because I had the utmost confidence in her", and that he "took it for granted she had done it."

The Deattes then lived at their home until June 1938, when they leased the house for a term of years and went to California. They returned to Rhode Island in September 1938, and soon thereafter again separated. On October 17, 1938, Mrs. Deatte instituted proceedings against her husband for divorce from bed and board on the grounds of extreme cruelty and gross misbehavior. During the pendency of such proceedings, Mrs. Deatte became sick and later died at her daughter's home on April 20, 1939.

Mrs. Duxbury immediately notified the complainant by telegram of Mrs. Deatte's death. She testified that shortly thereafter he came to her home, where her mother's body was, and said to her: "I will leave everything to you, I haven't any money." The funeral was held from her home and she paid all expenses incident thereto. The complainant admitted that, to avoid a "brawl", he did not attend the funeral; neither did he send any token of remembrance.

Mrs. Duxbury further testified that at this same time the complainant also told her that: "If you will turn everything over to me I will pay the funeral expenses and pay you well for what you have done." What he meant by this statement she did not know, nor did she inquire because of existing conditions. According to Mrs. Duxbury, the complainant at no time claimed to her that Mrs. Deatte had agreed to leave him any property by will.

Mrs. Mary Louisa Osborne, who conducted a small store near the Deatte home, testified for the complainant and said that she first became acquainted with Mrs. Deatte by reason of her coming to that store; that later she met the latter's husband; that on a certain occasion Mrs. Deatte told her that she and the complainant were going to California; that the latter was going to deed the property over to her "to keep it together", and that it was understood between them that she was going to make a will "protecting" him, if anything happened to her. This witness, while so testifying, described Mrs. Deatte as "a trustworthy, reliable person, a woman of her word", who "wasn't one to tell her business to outsiders."

Henry M. Dexter, another witness for the complainant, testified that he had known the complainant since 1918, and had met his wife a few times; that the complainant, accompanied by his wife, had occasion to call at his house in connection with some work that he was doing for him; that, while the three of them were in his yard, Mrs. Deatte told him that she and her husband were going to California; that he, Dexter, then asked her if they were going to sell the property, and that she answered: "No, Henry has deeded it all over to me, signed it all over to me. I am going to make a will out and take care of him."

Our statement of the foregoing facts and circumstances, which does not attempt to include therein the many incidents, assertions, denials, explanations and excuses appearing in the transcript of this cause, were extracted by us from

a mass of confusing and sharply conflicting testimony, reasonably open to different inferences and conclusions. In such a situation, the credibility of the testimony and the weight of the evidence are important factors in the cause. The trial justice had the advantage over us of hearing and seeing the witnesses. His decision, which he gave from the bench, concludes as follows: "Now I have pointed out, Gentlemen, what seems to me to be serious inconsistencies and improbabilities in the testimony of Mr. Deatte, and it is the settled opinion of this Court that the complainant has failed to establish by evidence which is clear and convincing that there was any such agreement made. For that reason, the prayer of the bill is denied, and the bill may be dismissed."

Counsel for the complainant urges before us that the decision of the trial justice should be reversed on two grounds: first, that he misconstrued the evidence; and secondly, that he applied a wrong rule of law in arriving at his conclusion. We are satisfied from our examination of the record in this cause that the first ground is without merit. The argument which he makes to us on this point relies mainly upon inferences and conclusions that would reasonably follow if the testimony by and for the complainant were undisputed or accepted as true. But this is not the case here. The testimony being in serious conflict, different minds might fairly differ as to the inferences and conclusions to be drawn from such testimony in the light of the surrounding circumstances and certain indisputable evidence.

Complainant's counsel argues particularly that the trial justice committed prejudicial error in refusing to give weight to the testimony of complainant's witness Mary Louisa Osborne. He urges that no reason appears in her testimony for him to offer the "suggestion" that she was relating what the complainant told her about the making of a will in complainant's favor and the burning of the deed of 1936, rather than what Mrs. Deatte told her, as she testified.

Having in mind all the testimony of this witness, we have examined the language used by the trial justice in his decision respecting her testimony. The suggestion of the trial justice to which the complainant objects must be read with what precedes and follows; it should not be isolated from its context, as the complainant does in arguing his contention.

Reading his decision as a whole, it is clear to us that all the trial justice meant by the so-called "suggestion" is that the testimony of this witness was not convincing. After a fair summary of her testimony supporting the complainant's claim, he weighs her entire testimony and expresses himself as follows: "It does seem rather strange that if we look at Mrs. Deatte as the type of woman Mrs. Osborne says she was, namely, a woman who kept her word, a woman who did not discuss her private affairs with her that Mrs. Deatte should have any such conversation with Mrs. Osborne. For reasons which I shall point out in a moment, I believe that what Mrs. Osborne is telling us here is not what Mrs. Deatte told her, but rather what Mr. Deatte told her." He then proceeds to consider the testimony of the complainant in the light of "well established facts"; he refers to the fact that neither the complainant nor his wife ever mentioned any agreement to make a will to the attorneys with whom they dealt; and finally he reaches the conclusion that we have above quoted.

What weight, if any, should be given to the testimony of this witness depends upon its credibility. The complainant accepts it as entirely true, while the trial justice apparently rejects it. We cannot say that the trial justice was clearly wrong in so doing, even if we concede that the complainant's view were possible.

The complainant's second contention is that the trial justice erred in holding that the alleged agreement to make a will must be proved by clear and convincing evidence. He

argues that such burden of proof is required only in that class of cases "in which a stranger in blood seeks, under an alleged parol agreement with the deceased, to take the property from the latter's heirs", but that where a person is related by blood or marriage "a preponderance of the evidence will suffice." His only pertinent authority for drawing such distinction is certain language of the court in the case of *Bower* v. *Daniel,* 198 Mo. 289, where, at page 327 of that opinion, the language just quoted is found.

We need not concern ourselves with the *Bower* case because it appears that in the later case of *Wanger* v. *Marr,* 257 Mo. 482, the Missouri court itself, at page 492 of that opinion, expressly disapproved the language relied upon by the complainant here. We find ourselves in accord with the decision of the Missouri court in the *Wanger* case, *supra,* and with all the other authorities on the point now under consideration that have come to our attention.

In the recent case of *Tillinghast* v. *Harrop,* 63 R. I. 394, 9 A. 2d. 28, which resembles the one at bar, this court says: "It is well settled that a court should not enforce an alleged contract by one person to leave property to another by will unless proved by clear and convincing evidence." The complainant's contention that the trial justice erred in his conception of the law is therefore without merit.

Upon a careful review of the evidence, we cannot say that the trial justice was clearly wrong in his conclusion on the facts. As we further find that he committed no error of law, his decision must be sustained.

The appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Edward M. Sullivan, John J. Sullivan,* for complainant.

*Sayles Gorham,* for respondent.