November 3, 2017

**Supreme Court**
No. 2015-87-C.A.
(P1/11-180C)

State                            :

v.                         :

Luis Padilla.                :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                     :

v.                        :

Luis Padilla.           :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  The defendant, Luis Padilla (defendant or Padilla), appeals his conviction of first-degree robbery[1] following a Superior Court jury-waived trial in Providence County.  This matter came before the Supreme Court on September 26, 2017, pursuant to an order directing the parties to appear and show cause why the issues raised should not be summarily decided.  After considering the arguments set forth in the parties' memoranda and at oral argument, we are convinced that cause has not been shown.  Thus, further argument or briefing is not required to decide this matter.  For the reasons outlined below, the Superior Court's judgment is affirmed.

---

[1] Padilla was convicted of first-degree robbery under G.L. 1956 § 11-39-1(a) after the trial justice determined that he "aid[ed], abet[ted] and assist[ed] Mr. Lugo and Mr. Rivera in the commission of first degree robbery of Justin McFadden on July 24[ ], 2010, and he is therefore guilty as a principal." *See State v. Long*, 61 A.3d 439, 447 (R.I. 2013) ("The law is well settled that one who aids and abets in the commission of the crime and is also present at the scene may be charged and convicted as a principal." (quoting *State v. Davis*, 877 A.2d 642, 648 (R.I. 2005))).

# I

## Facts and Travel

This appeal arises from an incident that occurred on July 24, 2010. On that date, Justin McFadden (complainant or McFadden), as he had in the past, went to the Crossroads'[2] clinic for medical services. The events that followed his arrival, however, interrupted his purpose and instigated the criminal prosecution that is at issue in this case.

McFadden testified that, when he arrived at Crossroads, he carried in his pockets his bank cards, bus pass, approximately $500 in cash, a necklace, and a bag of medication. He immediately went downstairs to the clinic, but learned that he could not be seen for at least another hour. He left and waited his turn in an outdoor locker area, sitting on the concrete floor with his back against a wall. He reported seeing two people, later identified as Juan Lugo (Lugo) and Jackson Rivera (Rivera),[3] about five to eight feet away, huddled together and conversing in Spanish. McFadden observed them for a short while before they turned to speak with a third man, later identified as Padilla, waiting outside the gate.[4] One of the men walked over to Padilla, who remained outside the gate, and both looked over at McFadden. At that point, they were approximately seventeen feet away from McFadden. From five to eight feet away, the third man continued to look "right at" him.

At this point, all three men came together and "came at [McFadden]." Approximately four feet before reaching him, Padilla "broke off" from the group. Rivera and Lugo continued

---

[2] Crossroads is an organization in Providence that offers shelter and other services to homeless individuals.

[3] Lugo and Rivera pled nolo contendere to their charges resulting from this incident and are not involved in this appeal.

[4] We recognize that the term "gate" is subject to multiple interpretations and, as such, it caused some confusion during trial. The trial justice addressed the confusion, saying "[o]ne thing we can call it is a door. We can call it a gate because it is attached to a fence. Usually when something opens attached to a fence you often call it a gate, but we can call it a door as well."

towards McFadden, and Lugo "pulled out a Rambo style knife and charged at [him]." After Lugo pulled out the knife, McFadden recalled him saying "I'm going to stab you" or "[g]ive what you have, your money." Rivera reiterated that sentiment, telling McFadden "[g]ive him the money."

Within a few seconds of these statements, Lugo stabbed McFadden in his arm. Padilla then "rushed at [McFadden]." McFadden remembered "[p]unching, kicking, whatever [he] could do" to protect himself. He testified that he tried to grab Lugo's arm. He remembered he "had a good grip on [Lugo]," but Padilla "hit [him] and [he] got turned around." Lugo then stabbed him multiple times in the back. McFadden testified that he felt "[o]ne gigantic [incision] and one not so gigantic [incision]." Rivera then "was trying to go in [McFadden's] pockets." Though in and out of consciousness at that point, McFadden felt his belongings being removed from his pockets. McFadden testified at trial that Padilla was the one who "hit [him] like a linebacker" before going through his pockets while he was on the ground. In his statement to the grand jury six months after the incident, McFadden had testified that Padilla "came up from behind [him] pretty quickly" after he was stabbed in the arm. He also noted that, while he wrestled Padilla, he "got a good look at his face."

At trial, McFadden testified that, following the stabbing, he chased after the three men. As he ran, he recalled seeing and hearing a woman, later identified as Frances Paban, who was "very upset" "screaming" at Lugo, "not in so many words saying you are an idiot, what are you doing." McFadden recalled that a person grabbed him from behind, attempting to stop his bleeding. Fire and rescue soon arrived and transported him to the hospital. He awoke a day or so later to learn that his kidney had been lacerated. In addition, he had superficial wounds on his arm and back, and an interior mesh had been inserted into his abdomen. He was initially

released from the hospital after one week, but later hospitalized a second time after developing an infection. He also spent six months using a walker upon his release.

The day after the attack, McFadden gave the police a recorded statement wherein he reviewed three photo arrays to identify his attackers. The police instructed McFadden to circle anyone who participated in the attack, and to write the nature of that person's involvement under his picture. McFadden identified Rivera as the man who said "give me the money" while approaching him alongside Lugo. In a second photo array, McFadden selected Lugo as the man who stabbed him. Finally, in a third photo array, McFadden recognized Padilla, who he acknowledged "was there." The police returned three days later to take another statement, at which time McFadden confirmed the previous photo identifications.

## A. Paban's Testimony

In addition to McFadden, Frances Paban also testified as a state's witness at trial.[5] Paban – fifteen years old on the date of the attack – frequently stayed with her boyfriend, Lugo, at Crossroads, and on July 24, 2010 spent the morning outside Crossroads' locker area doing drugs with him. Despite her altered state, Paban recalled seeing Lugo, Rivera, and Padilla in the locker area that day.

While in the locker area, Paban heard Lugo and Rivera tell each other in Spanish,[6] in the presence of McFadden, that they wanted to rob him. When she heard this, Paban had lost sight of Padilla, though she had previously seen him sitting silently atop a crate shaving his legs about thirty feet away from Lugo and Rivera. Paban "went to go see what was going on," and testified that, when she reached Lugo, she did not see anyone besides Rivera in his immediate vicinity.

_____

[5] The state called two other witnesses to testify as well: Officer Jose Deschamps and Det. Emilio Matos, Jr. The defense called one witness, Lugo, who testified that Padilla was not involved in the robbery and, instead, that he acted alone.
[6] Paban testified to her belief that Lugo and Rivera knew the victim did not understand Spanish.

After Lugo told her to sit back down, she returned to her previous spot, from which she could no longer see Lugo and Rivera, and she "sat on a crate, * * * put [her] headphones * * * on" and "zoned out." Approximately five to ten minutes later, Paban saw Lugo come "outside of the locker, behind from where the locker was[,] with blood on his hands and on his clothes." Temporarily deafened by her headphones, Paban said she had not heard any commotion, nor had she seen Padilla move from the crate.

Amid the chaos, Paban and Lugo agreed to meet at Amos House.[7] She rode a bicycle to the agreed place. Paban, unaware of Rivera's location, met Lugo at Amos House; and, as Lugo sat down at a picnic table, she saw the handle of a knife and blood dripping down his pants leg. Shortly thereafter, Rivera arrived, followed by Padilla. The police interrupted their rendezvous moments later, "thr[owing] [Lugo] to the floor, lift[ing] up his shirt and f[inding] his knife."[8] Meanwhile, Rivera was about six picnic tables away.

After the police arrested Lugo, Paban went to the police station with Det. Emilio Matos and gave a full recounting of the morning's events. Later that evening, however, Paban returned to the station seeking to change her statement. While her second statement references Padilla's involvement, her first statement makes no mention of him. In her second statement to Det. Matos, Paban, in describing the events, said "[Padilla] got involved in it and [he] said I will watch but I want half and they said all right." She elaborated that "[Padilla] was at the end of it,

---

[7] Amos House is an organization that offers food, shelter, and social services to those in need in the Providence area.

[8] During trial, Officer Jose Deschamps testified about his experience escorting Lugo to the police station. Deschamps recalled Lugo telling him: "I know who took the money. It was two of my fam. They are probably going back to Crossroads. Oh, shit, there they are." Deschamps then saw "two male subjects," later identified as Rivera and Padilla, walking down the street. Lugo, with his hands cuffed behind his back, motioned his head in Rivera and Padilla's direction. Deschamps broadcast a description of Rivera and Padilla over his radio, and officers arrived and arrested them.

at the end of the gate watching it * * * he was very aware of [what was going on] * * * he * * * [w]anted a cut." At trial, Paban again switched her story, testifying that Padilla had nothing to do with the incident and instead helped the victim tend to his wounds. In addition, she testified that, following her first statement to police but before her second, she used drugs.

Toward the end of her trial testimony, Paban asked the trial justice if she could "come up and talk to [him] * * * away from everybody else." He denied her request, but directed the prosecutor to bring her issue to his attention if necessary. Later in her testimony, Padilla's attorney asked Paban to read her witness statement aloud, to which she responded "[I] can't read. I can follow along if you read but I can't read it." Upon further inquiry, she clarified that she had a limited reading ability such that she can read names and can "follow along if [someone] read[s] it out loud."

Throughout her trial testimony, each time counsel for either side referred Paban to her witness statements, they either read her the statement or played her a recording of it. Moreover, prior to testifying, Paban was both permitted to listen to a recording of her statement and provided with a transcript of it. When asked if she recognized the transcript of her statement, she indicated that she did; she said she followed along with the transcript while listening to the recording at the station.

Padilla moved to dismiss his charge pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure after the state rested, but the trial justice reserved his decision until the defense presented its case. At the conclusion of all evidence, the trial justice denied the motion to dismiss. In so doing, the trial justice quoted *State v. McKone*, 673 A.2d 1068 (R.I. 1996), which allows that "if the trial justice in a criminal case setting concludes that the trial evidence is sufficient to establish guilt beyond a reasonable doubt, he or she denies the defendant's motion to

dismiss and, if both sides have rested, enters decision and judgment of conviction thereon." *Id.* at 1073. He ultimately determined that the evidence proved Padilla guilty of first-degree robbery beyond a reasonable doubt. On April 14, 2014, he sentenced Padilla to fifteen years at the Adult Correctional Institutions, with four years to serve and eleven years suspended with probation. Padilla filed a notice of appeal on April 15, 2014.

## II

## Standard of Review

"[T]his Court affords great deference to a trial justice's credibility determinations when sitting without a jury." *State v. Edwards*, 147 A.3d 982, 987 (R.I. 2016). "When reviewing determinations of credibility and findings of fact by a trial justice sitting without a jury, this Court will not disturb the trial justice's findings unless they are clearly wrong or the trial justice misconceived or overlooked material evidence on a controlling issue." *State v. Erminelli*, 991 A.2d 1064, 1069 (R.I. 2010) (quoting *State v. Adewumi*, 966 A.2d 1217, 1222 (R.I. 2009)). "When the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached." *Edwards*, 147 A.3d at 987 (quoting *State v. Van Dongen*, 132 A.3d 1070, 1076 (R.I. 2016)).

## III

## Discussion

On appeal, Padilla argues that the trial justice committed two errors warranting reversal of his conviction: (1) that the trial justice misconstrued McFadden's testimony as to who confronted him; and (2) that the trial justice erred in relying on Paban's witness statements where

her inability to read rendered her unable to acknowledge them. We will discuss each issue in turn.

### A. McFadden's Testimony

Padilla first challenges the trial justice's characterization of the attack, arguing that he inaccurately recounted McFadden's testimony and, specifically, that he erred in saying that "all three men approached [McFadden]" and "all three confronted [McFadden]." Padilla argues that, rather than "all three" approaching the complainant, McFadden actually testified that only Lugo and Rivera approached and confronted him. We disagree and instead hold that the trial justice, in summarizing McFadden's testimony, accurately recounted it.

In describing the complainant's testimony, the trial justice highlighted that "Mr. McFadden then testified that all three men approached him. He could tell from their demeanor as they approached that 'something bad was going to happen close.'" Padilla primarily takes issue with the trial justice's statement that he "confronted" McFadden along with Lugo and Rivera. However, we do not find the trial justice's indication that Padilla participated in the initial confrontation inconsistent with the record. During his testimony, McFadden narrated that the "man that was standing [ten] feet away was joined by the other two and they came at me." When asked specifically by the trial justice whether "all three c[a]me towards you," he answered in the affirmative. We believe, contrary to Padilla's argument, that "confront" accurately describes McFadden's narration of Padilla's actions – that Padilla "c[a]me towards" McFadden with Lugo and Rivera before retreating.

Furthermore, it is clear that Padilla takes the trial justice's summary out of context. While he is correct that McFadden testified that Padilla "broke off and was near the [gate] area" after approaching the complainant, the trial justice also spoke of Padilla's departure from the

group. The trial justice, after saying that "all three men approached [McFadden]," continued that "[s]hortly after all three confronted him one of the men who he later identified as Mr. Padilla broke off from the confrontation * * *." Later, the trial justice reiterated that "[McFadden] recalled all three men approaching and he sensed something bad was about to happen. As the confrontation between Mr. McFadden and these men began, he recalled Mr. Padilla breaking off from the group and taking a position near the gate area or the entrance to that locker area." This Court has said that a trial justice should not "pick one isolated statement in a witness's testimony out of context from the whole of it." *State v. Brown*, 709 A.2d 465, 481 (R.I. 1998). It follows, then, that counsel should refrain from doing the same. *See Deatte v. Duxbury*, 66 R.I. 1, 9, 17 A.2d 24, 27 (1940) ("The suggestion of the trial justice to which the complainant objects must be read with what precedes and follows; it should not be isolated from its context * * *.").

The trial justice did not "misconceive[ ] or overlook[ ] material evidence" sufficient to warrant reversal. *Erminelli*, 991 A.2d at 1069. Rather, Padilla has sequestered one sentence of the trial justice's bench decision without relating it back to the whole. Thus, we accept the trial justice's summary as accurate.

### B. Paban's Prior Statements

Next, Padilla challenges Paban's recognition of her prior witness statements during her testimony. He argues that Paban's concession late in her testimony that she could not read rendered her unable to effectively acknowledge her prior statements, which the trial justice relied on in finding him guilty. Padilla's argument, however, is unpersuasive.

In light of the trial justice's revelation that Paban's testimony was "the most enlightening and damaging * * * which clearly implicates and explains in detail Mr. Padilla's participation in this robbery," it is not surprising that Padilla seeks to undermine it. "However, as we have stated

many times, this Court's 'raise-or-waive' rule precludes our consideration of an issue that has not been raised and articulated at trial. * * * It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *State v. Bido*, 941 A.2d 822, 828-29 (R.I. 2008). Padilla did not take issue with the prosecutor's use of Paban's prior statements at trial, and his failure to challenge it then precludes him from now raising the argument on appeal. As such, having failed to preserve it, Padilla has waived his objection.

Nevertheless, even if we were to overlook the "raise-or-waive" rule, we still would not be inclined to hold that the trial justice erred in relying on Paban's testimony regarding her prior statements. In his bench decision, the trial justice recalled that, during her testimony, "[Paban] was confronted with the inculpatory statements she attributed to Mr. Padilla that were contained in her second taped statement * * *. Those statements from her recorded statement were placed in front of her in the courtroom and she in her statement acknowledged all of these statements were made in her presence according to that recorded statement." Padilla argues that Paban's inability to read means she was unable to recognize her prior statements. However, his argument relies on the misconception that the prosecutor asked Paban to read her statements before she acknowledged them as her own. Instead, before asking Paban if she recalled a specific statement, the prosecutor either read it to her aloud or played her a recording of it, in which she recognized her voice.[9] Moreover, during her testimony, Paban had a copy of the transcript in front of her, and she told Padilla's counsel that she could "follow along if [someone] read[s] it out loud," which is precisely what the prosecutor did.

---

[9] In fact, after Paban's disclosure, Padilla's counsel offered to utilize the same method as the prosecutor by reading Paban her statement – the same procedure with which Padilla now takes issue.

- 10 -

A review of Paban's testimony reveals that she was capable of recognizing her prior statements, and could do so through the means the prosecutor used. So, "[r]ather than misconceive or overlook evidence, the trial justice duly considered" Paban's testimony and statements. *Edwards*, 147 A.3d at 987. Padilla's contention that "the trial record indicates that she had no ability to recognize [her July 24, 2010 statement's] accuracy or inaccuracy" reflects a distorted view of the record and one that we reject.

## IV

## Conclusion

For the aforementioned reasons, the Superior Court's judgment is affirmed. The record may be returned to that tribunal.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Luis Padilla. |
| **Case Number** | No. 2015-87-C.A. (P1/11-180C) |
| **Date Opinion Filed** | November 3, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General |
| | For Defendant:<br><br>Jeffery Biolchini, Esq.<br>J. Richard Ratcliffe, Esq. |